McNAMEE, District Judge,
dissenting:
I find that Dr. Wang is entitled to qualified immunity because she did not violate either the Fourth Amendment or clearly established law. From Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), to Taylor v. Barkes, — U.S. -, 135 S.Ct. 2042, 192 L.Ed.2d 78 (2015), the Supreme Court’s direction has been consistent: particularized facts and legal standards — not generalized propositions of law — determine whether a state actor is entitled to qualified immunity. The Court has stressed that “when properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law.” al-Kidd, 131 S.Ct. at 2085 (internal quotations omitted). Applying these principles to Dr. Wang’s case, I cannot join the majority in denying qualified immunity to Dr. Wang, a respected physician, professor, and 23-year veteran of the UCLA Suspected Child Abuse and Neglect team whose actions were anything but malicious or incompetent.
I. Fourth Amendment Seizure
The record before us does not support a finding that Dr. Wang violated the Joneses’ constitutional rights. I disagree with the majority’s reasoning on a number of grounds. First, the majority cobbles together multiple 1 facts spanning over three days to find that Dr. Wang seized G.J. However, as noted in the opinion, “[a] seizure is a single act, and not a continuous fact.” Hodari D., 499 U.S. at 625, 111 S.Ct. 1547. I therefore disagree with the majority’s analysis.
Second, the affirmative evidence does not show that the Joneses gave involuntary consent. Even if we were to assume that Dr. Wang seized G.J., a seizure of a child is reasonable where the official obtains parental consent. James, 606 F.3d at 652 n. 2. “[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force.” Schneckloth, 412 U.S. at 228, 93 S.Ct. 2041. The only affirmative evidence “implying” that the Joneses did not give or maintain voluntary consent to G.J.’s hospitalization stems from communications and actions of third parties — nurses, police, and Rivas — to which no causal link implicating Dr. Wang has been drawn. In fact, the record shows that Dr. Wang unambiguously ordered that, without a hold issued by DCSF, the Joneses were not to be prevented from leaving with G.J. Further, the Joneses admit that Dr. Wang did not explicitly threaten G.J.’s detention. Therefore, as the affirmative evidence does not suggest that the Joneses gave involuntary consent, we cannot find that Dr. Wang violated the Joneses’ Fourth Amendment rights. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding *1010 that the moving party bears no duty to negate the opponent’s claims).
Third, the majority improperly uses Dr. Wang’s subjective intent. If, as the majority suggests, the relevant inquiry is whether the Joneses felt free to leave, then unknown facts to-the Joneses, such as Dr. Wang’s underlying intent in recommending hospitalization, are immaterial. See Scott v. U.S., 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). Moreover, as the Fourth Amendment requires an objective analysis, it is dispositive that the Joneses have offered no evidence, expert testimony or otherwise, suggesting that Dr. Wang acted objectively unreasonably in recommending accelerated testing to address G.J.’s injuries. Id.; Celotex Corp., 477 U.S. at 323, 106 S.Ct. 2548. Accordingly, I find that Dr. Wang did not violate the Joneses’ rights.
Turning now to exigency, deference must be given to Dr. Wang’s findings of immediate harm. The majority argues that no exigency existed because Dr. Wang had not “concluded that G.J.’s rib fractures were the result of abuse.” Op. at 1003. However, our case law does not require a definitive diagnosis. See Rogers, 487 F.3d at 1294; Mabe, 237 F.3d at 1108 (holding that exigency requires a state, actor to hold at least a “reasonable cause to believe” that a child would be seriously harmed in the time necessary to obtain a warrant). The record shows that Dr. Wang (along with Dr. Lauren Kim and Yolanda Johnson (DCFS supervisor)) found that G.J.’s newly-discovered injuries caused by his parents were “highly specific and concerning for non-accidental trauma” and believed that G.J. would be harmed if allowed to return home. It is undisputed that the medical literature supports this finding.[1] As it was only reasonable to assume that the Joneses would have taken G.J. from the hospital upon his release, Dr. Wang had “reasonable cause” to fear for G.J.’s immediate safety.[2] Accordingly, deference to Dr. Wang’s finding of exigency is proper by mandate. See Saucier v. Katz, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (cautioning against “the 20/20 vision of hindsight” in favor of deference to the judgment of reasonable state actors on the scene).
Overall, even when viewed in the Joneses’ favor, the record does not suggest that Dr. Wang violated the Joneses’ constitutional rights. In my opinion, G.J.’s progressing, textbook injuries suffered while in the exclusive custody of his parents gave Dr. Wang adequate evidence of child abuse and imminent harm to meet even higher levels of suspicion than that re *1011 quired by our case law. We should not now expose Dr. Wang to liability simply because she recommended further testing.
II. Clearly Established Law
Even assuming that Dr. Wang violated the Joneses’ constitutional rights, she is entitled to qualified immunity because (A) the facts of this case differ materially from our existing case law in 2010 and (B) the legal standards from the other Circuits are in disagreement.
A. Wallis, Mabe, Rogers
Under the majority’s holding, Dr. Wang would be exposed to liability because she recommended further hospital testing and monitoring for a nonverbal infant suffering from a complex depressed parietal skull fracture, an occipital skull fracture, extra axial bleeding, and bilateral posterior rib injuries. The majority does not dispute the medical literature, of which Dr. Wang was aware, confirming that these injuries were highly indicative of child abuse. Nor does it contest either Dr. Wang’s or Michael Jones’s conclusion that Jill Jones’s March 5 explanation for G.J.’s injuries was inadequate. Nonetheless, the majority, citing Rogers, 487 F.3d at 1295-96, and Mabe, 237 F.3d at 1106-07 (quoting Wallis, 202 F.3d at 1138), finds that there was no “imminent danger of serious bodily harm” to G.J.[3]
We must apply the test — or what the majority calls the “general rule” — announced in Wallis and adopted by Mabe and Rogers “in light of the specific context of the case, not as a broad general proposition.” Brosseau, 543 U.S. at 198, 125 S.Ct. 596. The contextual similarities between Dr. Wang’s investigation and our then-existing ease law are therefore of paramount importance in determining whether Dr. Wang knew or should have known that her actions violated the constitution. See Id.
“Even a cursory glance at the facts,” City & Cnty. of San Francisco, Calif v. Sheehan, — U.S. -, 135 S.Ct. 1765, 1776, 191 L.Ed.2d 856 (2015), from Wallis, Mabe, and Rogers confirms just how different those cases are from this one. This is not a case involving a social worker or a police officer. Wallis, 202 F.3d at 1131; Mabe, 237 F.3d at 1105; Rogers, 487 F.3d at 1291. This is not a case where home removal is at issue. Id. This is not a case where the injuries to the child were imagined, Wallis, 202 F.3d at 1131-32, specific to a certain time of day, Mabe, 237 F.3d at 1105, or mere signs of “child neglect”, Rogers, 487 F.3d at 1291. Nor is this a case where the child was able to communicate. Wallis, 202 F.3d at 1131-32; Mabe, 237 F.3d at 1105; Rogers, 487 F.3d at 1291. In sum, “there is a world of difference,” Sheehan, 135 S.Ct. at 1776, between a social worker removing young- children without physical manifestations of abuse from their homes and Dr. Wang recommending hospital care to a nonverbal infant with textbook head and rib injuries suggesting serious child abuse. Given the unique situation presented in this case, a finding that “every reasonable official [in Dr. Wang’s situation] would have under *1012 stood that what he is doing violated” a constitutional right is simply unsupported. Taylor, 135 S.Ct. at 2044; Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).
B. Lack of Circuit Consensus
“[T]o the extent that a robust consensus of cases of persuasive authority could itself clearly establish the federal right [alleged], no such consensus exists here. If anything, the opposite is true.” Sheehan, 135 S.Ct. at 1778 (internal markings and citations omitted); see Gates v. Texas Dept. Of Protective and Regulatory Servs., 537 F.3d 404, 428-29 (5th Cir.2008) (discussing the various standards applied by the Circuits); Gomes v. Wood, 451 F.3d 1122, 1130 (10th Cir.2006) (highlighting the broad disagreement concerning exigency in child abuse investigations); Hatch v. Dep’t for Children, Youth & Their Families, 274 F.3d 12, 21 (1st Cir.2001) (calling Wallis the minority view). That the Circuits cannot agree over the correct legal standard further calls into question whether the Ninth Circuit’s child abuse investigation law is “beyond- debate.” al-Kidd, 131 S.Ct. at 2083.
III. Conclusion
The lack of affirmative facts implicating Dr. Wang, the distinct circumstances of this case, and the cornucopia of child abuse investigation standards lead me to find that Dr. Wang is entitled to qualified immunity. “Reasonable minds may disagree concerning the quantum of risk faced by [G. J.], but, under the circumstances, it was hardly malicious or ‘plainly incompetent’ ” of Dr. Wang to recommend additional testing and monitoring. Kirkpatrick, 792 F.3d at 1202-03 (Kozinski, J., dissenting). I share Judge Kozinski’s concern that “future babies will pay with their lives” due to the current trajectory of our qualified immunity case law. Id. I also fear that today’s decision will encourage state officials, particularly investigating doctors, to forgo medically reasonable tests and procedures before making life-altering accusations. I therefore respectfully dissent from the majority’s opinion.

. The literature provides, in relevant part:
Overall, a rib fracture for children under three years of age had a positive predictive value of 95% for the diagnosis of non-accidental trauma. After exclusion of children with a defined history of accident and/or disease, the positive predictive value for non-accidental trauma increased to 100%. Katherine Barsness M.D., et al. The Positive Predictive Value of Rib Fractures as an Indicator of Nonaccidental Trauma in Children, Journal of Trauma, Vol. 54, No. 6, June 2003, at 1107-10); see also Blake Bul-loch, et al., Cause and Clinical Characteristics of Rib Fractures in Infants, Pediatrics, Vol. 105, No. 4, April 2000, at 1-5, (reporting that 82% of rib fractures in infants less frían one year old were caused by child abuse); and Christine Chiaviello, et al., Stairway-Related Injuries in Children, Pediatrics, Vol. 94, No. 5, November 1994, at 679-81 (reporting that severe head injury is compatible with stairway related fall, however injuries involving multiple body regions, or severe truncal or extremity injuries should prompt a search for an alternate mechanism including intentional trauma) (emphasis added).

. Indeed, the likelihood of parents remaining in the hospital while officials seek to obtain a warrant is “cold comfort when the life of a newborn baby is at stake.” Kirkpatrick, 792 F.3d at 1202 (Kozinski, J., dissenting).

. To circumvent a portion of the qualified immunity analysis, the majority submits, while concurrently finding that "[tjhis case presents complex legal and factual issues,” that Dr. Wang "obviously” seized G.J. Op. at 1005-06, 1007-08. I oppose this argument based on my positions expressed in the previous section: I also highlight that the sitter placed in G.J.'s room did not materially change the Joneses' freedom to leave, as it is undisputed that Dr. Kim, the attending physician when the sitter was placed, held both the obligation and authority to discharge the Joneses, regardless of the- sitter's presence. While this fact does not necessarily address whether the Joneses felt free to leave, it further confirms that the record does not sufficiently implicate Dr. Wang.